1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT COURT OF CALIFORNIA

10

11 JOSEPH F. FRANKL, Regional Director
   of Region 20 of NATIONAL LABOR
   RELATIONS BOARD,

12
                          Petitioner,                    No. 2:13-cv-02354-KJM-AC
13
           vs.
14

15 FAIRFIELD IMPORTS, LLC d/b/a
   FAIRFIELD TOYOTA, MOMENTUM
16 AUTOGROUP, and MOMENTUM
   TOYOTA OF FAIRFIELD,
17
                          Respondent.                    ORDER
18 _____/

19

20

21             Petitioner, Regional Director of the National Labor Relations Board, seeks an

22 injunction reinstating the employment of Frank Bartolomucci, who worked as a technician in the service

23 department of respondent's car dealership.  Respondent claims Bartolomucci was fired for stealing tires

24 and for insubordination.  Petitioner Regional Director, on behalf of the General Counsel of the National

25 Labor Relations Board ("NLRB" or "Board"), contends those reasons "are disingenuous and

26 pretextual."  (ECF No. 4, at 7.)  Petitioner has filed an unfair labor practice complaint against

27 respondent asserting respondent fired Bartolomucci because of his union activities in violation of

28 section 8(a) of the National Labor Relations Act ("NLRA"), which prohibits employers from

1

discriminating against an employee in the terms and conditions of employment in order to discourage union membership, and pursuant to a unilaterally changed policy in violation of respondent's obligation to collectively bargain.  29 U.S.C. § 158(a)(3), (5).

Presently before the court is petitioner's motion for a temporary injunction under section 10(j) of the NLRA, 29 U.S.C. § 160(j), pending resolution of petitioner's unfair labor practice claim before an Administrative Law Judge ("ALJ") and ultimately before the Board.  Specifically, petitioner asks the court to order respondent, Fairfield Imports (doing business as Fairfield Toyota), to offer its former employee Frank Bartolomucci reinstatement to the job position that he previously held and to rescind the unilaterally changed policy regarding discarded tires, among other incidental relief, pending the final disposition of petitioner's unfair labor practice claim against respondent.  The court heard argument on petitioner's motion for a preliminary injunction on December 20, 2013.  Matthew C. Petersen appeared for the petitioner, and Patrick W. Jordan appeared for the respondent.  Also present was Matthew Gauger for Automotive Machinists Lodge No. 1173.  For the reasons explained below, petitioner's motion is GRANTED.

I.      BACKGROUND

        A.      Regulatory Framework

An understanding of the regulatory framework and the administrative process of unfair-labor-practice adjudications informs the court's decision on petitioner's motion for an injunction. Section 7 of the NLRA guarantees employees the right to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.  Section 8 prohibits employers from engaging in "unfair labor practices," including interfering with, restraining, or coercing employees in the exercise of their section 7 rights, 29 U.S.C. § 158(a)(1), and prohibits employers from discriminating against employees "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization," *id.* § 158(a)(3).

The NLRA also empowers the NLRB to adjudicate labor disputes, including "unfair labor practices" charges filed by private parties.  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138

(1975). "[T]he process of adjudicating unfair labor practice cases begins with the filing by a private party of a 'charge.'" *Id.* (citations omitted). Then the NLRB's Office of General Counsel investigates the charge and decides whether a "complaint" should be filed. *See id.* at 138–39. As a practical matter, the General Counsel has delegated the initial power whether to issue a complaint to NLRB Regional Directors, 29 C.F.R. §§ 101.8, 102.10, and petitioner is the Regional Director for Region 20, which includes Northern California.

Once a complaint has been filed, an ALJ presides over a formal trial and files a decision. If no timely exceptions to the ALJ's decision are filed, the ALJ's decision automatically becomes the decision of the Board; otherwise, the Board will review and decide whether there has been an unfair labor practice. The Board's decision may then be enforced by, or appealed to, a U.S. Court of Appeals.

Accordingly, it "takes considerable time—sometimes years—for the administrative process to conclude." *Frankl v. HTH Corp.* (*HTH Corp. I*), 650 F.3d 1334, 1340 (9th Cir. 2011). "As a result of 'the relatively slow procedure of Board hearing and order, followed many months later by an enforcing decree of the circuit court of appeals it may be possible for persons violating the act to accomplish their unlawful objective before being placed under any legal restraint and thereby to make it impossible or not feasible for the Board to restore the status quo." *Id.* (internal alteration and quotation marks omitted) (quoting S. Rep. No. 80–105, at 27 (1947)). So the NLRA was amended to include section 10(j) to remedy this problem. *Id.*

Importantly for a decision on the pending motion, section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), empowers the NLRB to apply to a federal district court for temporary injunctive relief once a complaint has issued that a company is engaging in an unfair labor practice. In this case, on May 30, 2013, Automotive Machinists Lodge No. 1173, District Lodge 190, International Association of Machinists and Aerospace Workers, AFL–CIO (the "Union") filed an original charge alleging that respondent engaged in unfair labor practices in violation of section 8(a)(1), (3), and (5) of the NLRA. The charge was referred to petitioner Regional Director, and upon investigation, petitioner determined there is a reasonable cause to believe that respondent is engaging in the unfair labor practice. Petitioner then, on July 31, 2013, issued an Order Consolidating Cases, Consolidated Complaint and

1  Notice of Hearing against respondent alleging respondent is engaging in unfair labor practices.  (ECF

2  No. 1.)  Counsel for petitioner clarified at the December 20 hearing that the Board itself voted and

3  approved the Regional Director's section 10(j) petition for an injunction.

    B.    <u>Proceedings Before the Administrative Law Judge</u>

5          On September 10, 2013, a hearing commenced before the ALJ.  Petitioner presented

6  "the bulk" of its "case-in-chief," and respondent had an opportunity to cross-examine "all but the last of

7  the witnesses" called by petitioner as acting General Counsel for the Board.  Currently, the proceedings

8  before the ALJ are in recess until January 21, 2014, at which point presumably the trial will resume and

9  respondent will present its case.  Accordingly, the record before this court is primarily "one side of the

10 story," albeit supplemented by respondent's proffered declarations and attached exhibits submitted in its

11 answer to the Regional Director's petition for an injunction.  (*See* ECF Nos. 17-1, 17-2, 17-3, 17-4, 17-

12 5, 17-6, 17-7, 17-8, 17-9, 17-10, 17-11.)

    C.    <u>Facts Likely to Be Proven</u>

14         The facts underlying the pending motion are extensive and largely disputed.  The court

15 notes at the outset that, "[i]n a § 10(j) case, the district court is not the ultimate fact-finder, but merely

16 determines what facts are 'likely to be proven' to determine if the standard for an injunction has been

17 met."  *Pye ex rel. NLRB v. Excel Case Ready*, 238 F.3d 69, 71 n.2 (1st Cir. 2001) (citing *Asseo v. Pan*

18 *Am. Grain Co.*, 805 F.2d 23, 25 (1st Cir. 1986)).  Accordingly, the following factual background is

19 drawn from the transcript of the proceedings before the ALJ and from respondent's submitted evidence,

20 and the court has weighed the evidence only to the extent necessary to determine the facts "likely to be

21 proven" to decide if the "standard for an injunction has been met."  *Id.*

22         Bartolomucci was employed as a technician in the service department of Fairfield

23 Toyota from 2003 until he was fired on May 20, 2013.  Fairfield Toyota is a car dealership that buys,

24 sells, and services automobiles, and it is owned by respondent.  Several years ago, in March 2010, a unit

25 of approximately fifteen Fairfield Toyota automotive technicians, including Bartolomucci, voted by

26 majority to be represented by the Union for purposes of collective bargaining with their employer, and

27 in October 2010 the Board certified the Union as the exclusive collective-bargaining representative of

28 respondent's technicians.

Respondent claims Bartolomucci was fired for work-assignment insubordination and stealing used tires; petitioner contends he was fired for supporting the Union.  Accordingly, the facts regarding (1) Bartolomucci's union activities, (2) the policies or practices concerning used tires, and (3) the policies or practices pertaining to the distribution of work assignments are relevant to the court's analysis of petitioner's pending motion.

### 1.   Bartolomucci's Union Activities

At the hearing before the ALJ, Bartolomucci testified about the events leading up to and following the Union election in March 2010.  In the days leading up to the election Bartolomucci openly showed his support for the Union at work: "[I] [t]alked about it.  I wore buttons, I put stickers—in my toolbox, tool cart area."  (Pet'r's Ex. C: Official Tr. of Proceedings Before the Board ("Tr.") 50:19–25, ECF No. 4-3 ("The buttons say 'union yes' on them.").)  Moreover, in the weeks leading up to the election, respondent's service manager Tony Mattice told Bartolomucci and the other technicians they were required to attend two meetings; at these meetings "a lawyer" and two "union busters" "talked about how unions weren't any good and like you have to pay dues and just basically put it down, in essence, that you don't—shouldn't want a union . . . ."  (Tr. 63:4–64:18.)  Twice, Bartolomucci participated in "union rallies" and picketed at Fairfield Toyota in the days after the election.  At one such rally, Bartolomucci observed respondent's current owner Rahim Hassanally, the previous owner Scott Thomason, and Mr. Mattice.  (Tr. 57:1–16.)  Bartolomucci testified that he observed Mattice "heckling" the picketers, and "heard him say 'there's three rats right there,'" referring to Bartolomucci and two former technicians who had since left Fairfield Toyota and were there "supporting the Union."  (Tr. 57:1–58:6.)

After the certification of the Union in 2010, respondent refused to recognize or bargain with the Union, that is until respondent was ordered to recognize and bargain with the Union by the U.S. Court of Appeals for the D.C. Circuit.  *White Motor Sales v. NLRB*, 486 F. App'x 130, 131, 2011 WL 2308712 (D.C. Cir. May 11, 2012) (unpublished) (holding "the Board did not abuse its discretion when it certified the union without holding a hearing on White Motor's objections to the election.").  Since the order was issued by the D.C. Circuit, respondent has participated in 23 collective-bargaining sessions with the Union over the last year.

In addition to his expressed support for the Union at the workplace and on the picket line, Bartolomucci also actively assisted the Union at the collective bargaining table.  From June 2012 until the present, Bartolomucci participated throughout contract negotiations as a member of the Union's bargaining committee.  (Tr. 555.)  At these negotiations, one of the issues that arose frequently was that respondent was not distributing work to its technicians in a fair manner.  Bartolomucci used himself as an example, claiming that other technicians would receive more lucrative and less intense work, and he would be given either no work or less desirable work.  (Tr. 585:2–87:6.)  This aspect of the case will be discussed in greater detail below.

2.      The Policies and Practices Regarding Used Tires at the Car Dealership

Victor Corona provided testimony and was subject to cross-examination at the hearing before the ALJ on September 11 and September 12, 2013, on the topic of used tires at the service department of respondent's car dealership.  Corona has been a service manager in the automotive industry for about twenty years, and he was the service manager at respondent's dealership from February 2012 until January 2013.  (Tr. 363:2–19.)

Corona described the way dealerships and service shops end up with discarded used tires as follows:

> [For example,] certified [pre-owned] vehicles have to have four matching tires.  So you could have two brand new tires and two 80 percent [tread] tires [on the used car] and we buy two to match the two, so it has four [matching tires].  So literally you're stuck with two tires that have 80 percent tread, so they're highly sought after [by the employees].

(Tr. 413:17–21.)

It is undisputed that Bartolomucci took discarded tires from respondent's service department while he was employed there.

///
///
///
///
///

6

(*See* Tr. 132:1–13.)[1]  Moreover, when respondent's Human Resources Manager, Michelle Lopez, confronted Bartolomucci and asked him whether he took tires from the shop on a particular occasion, Bartolomucci told her that he had.  (Decl. Michelle Lopez ¶ 14, ECF No. 17-6.)  In fact, when another technician was questioned by Lopez about an incident in which that technician observed Bartolomucci taking tires on May 7, that technician said he "assumed [taking the tires] was OK because Frank was doing it in plain sight."  (*Id.* ¶ 12.)  Shortly after the confrontation with Lopez about the tires, Bartolomucci was fired and told his termination was, in part, "for stealing tires."  (*Id.* ¶¶ 22–24.)

It is hotly disputed whether respondent, as a matter of policy, strictly prohibited employees from taking discarded tires, or whether, as a practical matter, employees were allowed to take discarded tires home.  Bartolomucci, and the Union's representative, Mark Hollibush, testified before the ALJ that respondent had a policy or practice permitting employees to take discarded tires.  In contrast, respondent submits the employee handbook and nearly a dozen declarations of current employees who declare there is no such policy and that, on the contrary, the dealership maintained a strict anti-theft policy that prohibited employees from taking parts that had been removed from customer vehicles.  (*See, e.g.*, Decl. Lopez ¶ 5.)  In addition to the declarations averring the same, respondent supports its contention that a policy existed prohibiting taking discarded tires by pointing to an incident involving another technician, who was discharged for taking oil from the shop.  (Decl. Lopez ¶ 13.)

Corona, who does not appear aligned with either of these two camps, supports the NLRB Regional Director's version of events, and testified that respondent's practice permitted

---

[1] Bartolomucci testified as follows:

Q    About how many tires have you taken from Fairfield Toyota in the past three years?

A    I'd estimate 100. . . .

Q.   Where did they come from?

A    From the shop—inside the shop.  And out in the—where we had a place to put them, like a bin for discarded tires.

Q    And were these tires that came from customer vehicles?

A    Yeah.   And used cars, too.

(Tr. 132:1–13.)

technicians to take home discarded tires.  Specifically, Corona testified that he personally observed six

employees, including the shop foreman Jesse Kobert, taking discarded tires:

> Q        So how do you know all of them were taking tires?
>
> A        I let them mount and balance with our equipment.  They would bring their own personal car in and dismount and mount the tires right in our shop.
>
> Q        So you would see them mounting used tires from the shop—
>
> A        Used tires for their car, yeah.
>
> . . . .
>
> Q        Which employees did you see doing this?
>
> A        Ashneel, Jesse, Johnny, Eddie, Don, Ton[y], all of them.  And even some of the salespeople started asking about them, and I simply told them that they had to pay to have them mounted and balanced . . . .

(Tr. 413:10–414:1.)  As the manager, Corona maintained a policy regarding discarded tires: "Simply

put, if you take a tire you let me know.  Q.  And so every time a technician would take a tire and replace

a tire, did they ask you before doing it or — A.  Yeah.  I'd say it was probably, you know, 80 percent."

(Tr. 417:11–20.)  Moreover, Corona testified that the employees told him it was a common practice for

employees to take discarded tires: "[Employees said], 'Well, we've always been able to take the tires.'

And everybody's, like, 'Yeah, you know, I mean, I'm not stealing them.'  I'm—you know, it would

come up in that way."  (Tr. 430:7–23.)

Corona's testimony confirmed he was not aligned with Bartolomucci or the Union.

Corona testified on cross-examination that he regularly told Human Resources Manager Michelle Lopez

that he wanted Bartolomucci fired:

> Q                    How many times did you tell Michelle Lopez you wanted to fire Frank Bartolomucci? . . .
>
> A                     . . . Oh, a thousand times.
>
> [ALJ:]              Seriously?
>
> THE WITNESS:     It was a lot.

(Tr. 480:6–14.)  Moreover, Corona testified he was brought in as the manager to handle "the Union

8

1  situation, [to ease] the negativity and the fighting between the technicians, the Union and management."

2  (Tr. 376:13–18.)  Corona even represented respondent, the employer, during several collective

3  bargaining sessions with the Union.  (Tr. 556:23–25.)

4          3.    <u>Work Distribution to Technicians at the Dealership</u>

5          Respondent argues Bartolomucci was fired in part for insubordination regarding a work

6  assignment.  The manner in which work is distributed in respondent's service department, and how

7  technicians are compensated, is discussed below.

8          Technicians at Fairfield Toyota are compensated on a flat-rate hourly basis: "the

9  amount of hours of labor times [a technician's] hourly rate."  (Tr. 380:10–13.)  The amount of hours for

10  which a technician is compensated, however, does not depend on the hours actually worked; rather, the

11  technician is compensated based on the hours a particular task is supposed to take.  (*See* Tr. 380:10–17.)

12  So if a technician worked "eight hours" and completed tasks assigned "20 hours of labor in one day," he

13  would be "paid 20 times his $30 an hour [wage]."  (Tr. 370:15–17.)  Accordingly, the most desirable

14  tasks were those that were assigned the most hours, and yet would take a technician less time to

15  complete: these tasks were called "gravy" around the shop.  (Tr. 377:18–23.)  Moreover, the dramatic

16  difference in potential earnings based on the particular tasks assigned led to "constant bickering,"

17  according to Corona, "over who's taking the gravy, you know," and placed pressure on the manner in

18  which tasks were assigned to technicians.  (Tr. 375–376.)

19          For the most part, work was assigned to technicians by employees called "service

20  advisors."  (Tr. 368:17–69:7.)  Service advisors, also called "service writers," assisted customers and

21  translated customers' concerns into a "repair order."  (*See* Tr. 368:24.)  Mostly, a technician received

22  work when a service advisor "walk[ed] out into the shop and hand[ed] [the repair order] to a guy," and

23  sometimes "the technicians came up [to the service advisors] and got work too . . . ."  (Tr. 368:24–

24  369:4.)  About "90 percent" of the work was "dispatched from the [service] writers themselves," and the

25  remaining ten percent was distributed by the service manager.  (Tr. 372:6–9.)

26          Pre-delivery inspections or "PDIs" are among the desirable "gravy" assignments

27  because PDIs involve a technician inspecting a new vehicle, and they pay "seven tenths of an hour to an

28  hour point 2," even though a PDI can be completed in "35 or 40 minutes."  (Tr. 489:4–25; *accord* Decl.

Sheila Bamba in Supp. Def.'s Opp'n to Pet. for Inj. ¶ 8, ECF No. 17-10.)

           In addition to complaints from technicians, this system occasionally led to technicians refusing to complete particular assignments.  The former service manager, Corona, testified:

> I would say almost all of [the technicians would tell me they couldn't do work].  They would get a warranty situation dispatched to them, and whether or not they could do it I don't think was the issue.  I think it was more about it pays two-tenths of an hour of labor to test drive, to do a water test, you know, to put tape on the window and re-drive it to see if that's where the leak's coming from.  The warranty doesn't pay anything, so it's very common for [technicians] to, you know, throw up their hands immediately, especially when they see the other master technicians doing easier work.

(Tr. 388:9–22.)  Accordingly, service advisors would approach the manager at that time, Corona, to complain that a technician was refusing to do work on "an almost daily" basis.  (Tr. 390:7–13.)  Moreover, some technicians expressed that they were unable to complete a particular assignment based on lack of expertise or ability "as often as two or three times in one day or you could go a week without hearing any of it.  It all depends on the workflow."  (Tr. 398:17–23.)

           Further, Corona's testimony revealed that management favoritism and antiunion animus may have played a role in the distribution of work:

> Q      [D]id [the service advisors] have any instructions as to how to delegate work or how to go about assigning work?
>
> A      Written?
>
> Q      Written.
>
> A      No.
>
> Q      How about oral?
>
> A      Yes.
>
> Q      And what were . . . those instructions?
>
> A      Basically, "Give it to the guys that are on our team."
>
> Q      And what do you mean by the team?
>
> A      Nonunion guys.

(Tr. 392:8–21.)

///

4.   <u>Bartolomucci's Termination</u>

On May 20, 2013, Bartolomucci came into work and "noticed a lot of technicians in the shop were doing PDIs." (Tr. 155:13–15.) After Bartolomucci completed a PDI he had left over from the day before, he approached the service manager, Sheila Bamba, and requested PDIs, but Bamba told him she had no PDIs at that time. (Tr. 156:14–18.) Bartolomucci claims Bamba "told [him] that she would try to get [him] some [PDIs] later." (Tr. 157:4–8.) Another service advisor offered Bartolomucci a check engine light job, and after attempting to diagnose the problem briefly, Bartolomucci returned the repair order to the service advisor and said, "I can't figure it out." (Tr. 160:9–14.) Bamba claims he worked on the check engine light task for only about twelve minutes. Nonetheless, according to Bartolomucci, the service advisor told him, "Okay. That's fine. . . . I'll have someone else do it," so Bartolomucci left to go to lunch. (Tr. 160:18–19.) According to Bartolomucci, he has had a history of trouble diagnosing check engine lights, an issue he claims to have raised with service managers in the past. (Tr. 93–99, 160–165.)

After lunch, Bartolomucci returned to the shop and noticed other technicians doing PDIs. (Tr. 174:5–7.) He then went back to talk to Bamba: "I went in there and I had asked her if she had any PDIs for me. . . . She said, 'Well you went to lunch. And I looked for you to give you one.'" (Tr. 174:23–175:3.) According to Bartolomucci, he merely "shared [his] concern about the hours that [he] was getting," (Tr. 175:2–24), but Bamba remembers the exchange differently:

> Frank got very upset and said that it was not fair that others were getting PDI work but not him. At this point I was becoming irritated with Frank and told him that the job I was assigning was just as easy and that he did not have the right to pick and choose what work he wanted to perform. Frank raised his voice and continued to complain that all he got was oil changes and I replied that when we try to assign work, he always declines it. Frank denied this and I reminded him that the 'check engine' light I assigned to him ended up being performed by someone else. At this point Frank was nearly yelling at me and told me he was not good at 'check engine' light work and that he was not going to do it. Frank then . . . told me that he did not make enough money to do 'check engine' work and that he was not going to do any work that was not going to make him any money. In the end, Frank did do the car inspection I had assigned.

(Decl. Sheila Bamba ¶ 18, ECF No. 17-10.)

///

Bamba interpreted Bartolomucci's statements as insubordination:

> [I]t was like Frank was throwing down a gauntlet, telling me that he was not going to do anymore 'check engine' work because he could not make a profit over the flat rate. . . .  As a manager, I cannot allow those under me to dictate what I can and cannot assign as that undermines my authority and creates a terrible precedent . . . .

(*Id.* ¶ 19.)

Bartolomucci remembers it slightly differently: "I said doing oil changes and check engine lights doesn't help me get my hours.  You have master diagnostic technicians doing PDIs all day long and I'm doing check engine lights," he told the ALJ.  (Tr. 175:17–20.)  Bartolomucci also told Bamba he "was going to inform the Union that was going on."  (Tr. 175:21–22.)  Bamba interpreted this last statement as Bartolomucci "[s]ort of threatening me with his phone call."  (Affs. & Docs. in Supp. of Pet. for Injunction, Ex. G, ECF No. 4-7, at 7:9–11.)  Bamba made notes about this conversation because "when Vic [Corona] was at the shop, he would tell me to keep track of times when tech[nicians] turned work down."  (*Id.*)

After this exchange, Bamba met with Michelle Lopez, the Human Resources Manager, and Pat Jordan, the company's attorney, and told them about her exchange with Bartolomucci.  (*Id.* ¶ 20.)  Later, she also discussed Bartolomucci with the owner, Rahim Hassanally.  (*Id.*)  "We discussed the incident in which Frank took tires without getting permission," although Bamba also noted "we did not specifically discuss Frank's insubordination at this meeting, [however,] I know that insubordination cannot be tolerated."  (*Id.* ¶¶ 20–21.)

Lopez described the meeting with Bamba and Hassanally as follows:

> Frank had violated two of our long-standing company policies and I believed that he should be discharged.  The three of us discussed whether other employees had engaged in similar behavior and what actions had been taken in the past.  With respect to taking used parts, we discussed the [case of another] competent technician [who] had been caught stealing motor oil and he was let go.  We further discussed two instances in which employees, who worked for Fairfield imports had been terminated for insubordination.  After discussing these other incidents I noted that Frank had engaged in conduct that the dealership had consistently treated as a firing offense and that if we did not terminate Frank, we would be acting inconsistently.  The three of us decided that Frank should be discharged.

(Decl. Lopez ¶ 22, ECF No. 17-6.)  Although Lopez admits "the three of us knew that Frank supported

12

the Union," she declares "the fact that Frank was part of the Union's bargaining committee did not factor at all in the decision to fire him."  (*Id.* ¶ 23.)

Lopez met with Bartolomucci in her office, with Mike Creedon, Director of Operations, present, and "told him that he was being fired for stealing tires and for being insubordinate."  (*Id.* ¶ 24.) Shortly after Bartolomucci's termination, twelve of the remaining thirteen technicians at Fairfield Toyota voted to decertify the Union.  (ECF No. 18 at 7:7–10.)

II.     STANDARD

Section 10(j) authorizes a district court to grant injunctive relief "it deems just and proper." 29 U.S.C. § 160(j). "To decide whether granting a request for interim relief under Section 10(j) is 'just and proper,' district courts consider the traditional equitable criteria used in deciding whether to grant a preliminary injunction." *McDermott v. Ampersand Publ'g, LLC*, 593 F.3d 950, 957 (9th Cir. 2010).

A court may issue a preliminary injunction to preserve the relative positions of the parties pending a trial on the merits. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  The party seeking injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Munaf v. Green*, 553 U.S. 674, 689–90 (2008).

Before the *Winter* decision, the Ninth Circuit employed a "sliding scale" or "serious question" test, which allowed a court to balance the elements of the test "so that a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Recently, the Circuit found that its sliding scale test survived *Winter*: a court may issue a preliminary injunction when a petitioner raises serious questions going to the merits and demonstrates that the balance of hardships tips sharply in his favor, so long as the court also considers the remaining two prongs of the *Winter* test.  *Id.* at 1135.  However, a court need not reach the other prongs if the moving party cannot as a threshold matter demonstrate a "fair chance of success on the merits."  *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (internal quotation marks omitted) (quoting *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2008)).

III.    ANALYSIS

    A.    Likelihood of Success on the Merits

        "On a § 10(j) petition, likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred" and that a U.S. Court of Appeals "would grant a petition enforcing that order, if such enforcement were sought." *Frankl v. HTH Corp.* (*HTH Corp. I*), 650 F.3d 1334, 1355 (9th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1821 (2012).  In making this determination, the court must "factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals." *Miller for & on Behalf of NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 460 (9th Cir. 1994).  Accordingly, "the regional director in a § 10(j) proceeding 'can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory.'" *HTH Corp. I*, 650 F.3d at 1356.  "But if the Director does not show that success is likely, and instead shows only that there are serious questions going to the merits, then he must show that the balance of hardships tilts sharply in his favor," as well as the other equitable elements for preliminary injunctive relief. *Id.* (citing *Alliance for the Wild Rockies*, 632 F.3d at 1135).

        Moreover, in this case, the court accords "the Regional Director special deference because the Board took the rare step of endorsing the Director's Section 10(j) petition." *Frankl ex rel. NLRB v. HTH Corp.* (*HTH Corp. II*), 693 F.3d 1051, 1062 (9th Cir. 2012).  Deference is warranted here because the Board's endorsement may "signal [its] future decision on the merits, assuming the facts alleged in the petition withstand examination at trial." *Id.* (quoting *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011)).

        Petitioner contends respondent is engaging in unfair labor practices in violation of section 8(a) of the NLRA in two ways: (1) respondent fired Bartolomucci because of his union activities, and (2) respondent has unilaterally changed its practice of allowing employees to remove discarded tires for personal use in violation of its obligation to bargain with the Union about conditions of employment.  Petitioner asks that the court grant interim injunctive relief under section 10(j) of the NLRA ordering respondent to (1) offer Bartolomucci immediate reinstatement to his prior job position

and (2) rescind the policy, at the Union's request, preventing employees from removing scrap tires and

provide the Union an opportunity to bargain over any changes to this policy.   The likelihoods of success

on the merits of these asserted violations of the NLRA are discussed separately in turn below.

1.   <u>Termination of Bartolomucci</u>

In this case, petitioner argues Bartolomucci was fired because of his Union activities in

violation of section 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3).   In section 8(a)(3) retaliatory discharge

cases, "the Board uses the burden-shifting scheme set forth in *Wright Line* to determine whether an

employer was motivated by anti-union animus."   *Healthcare Emps. Union v. NLRB*, 463 F.3d 909, 919

(9th Cir. 2006) (citing *Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), *upheld in NLRB v. Transp. Mgmt.

Corp.*, 462 U.S. 393, 399–403 (1983)).   Under *Wright Line*, the Regional Director must first "make a

prima facie showing sufficient to support the inference" antiunion animus "was a 'motivating factor' in

the employer's decision.   Once this is established, the burden will shift to the employer to demonstrate

that the same action would have taken place even in the absence of protected conduct."   *Id.* (quoting

*Wright Line*, 251 N.L.R.B. at 1089).   Although the Regional Director or General Counsel retains the

ultimate burden of persuasion before the Board itself, "once the General Counsel establishes that anti-

union animus was a motivating factor, the employer bears the burden of establishing . . . the inevitability

of termination."   *Schaeff Inc. v. NLRB*, 113 F.3d 264, 267 n.5 (D.C. Cir. 1997).

Because the "employer will seldom admit that it was motivated by anti-union animus,"

"circumstantial evidence is sufficient to establish anti-union" animus was a motivating factor in the

decision to terminate an employee.   *Healthcare Emps. Union*, 463 F.3d at 919.   Indicia that support an

inference that antiunion animus was a motivating factor in the termination of an employee include:

(i) the employer's knowledge of the employee's union activity, (ii) the employer's "antipathy toward"

union activity, and (iii) "the timing of the adverse employment action."   *E.C. Waste, Inc. v. NLRB*, 359

F.3d 36, 42–43 (1st Cir. 2004); *accord Healthcare Emps. Union*, 463 F.3d at 919–20.

After carefully considering the parties' arguments and the evidence of record, as

discussed below, the court finds the evidence presented at the ALJ hearing thus far is sufficient to

establish a likelihood of success on the merits.

///

15

1          Here, Michelle Lopez, the Human Resources Manager admits that she, service manager

2    Sheila Bamba, and respondent's owner Rahim Hassanally "knew that Frank [Bartolomucci] supported

3    the Union" and that he was part of the Union's "bargaining committee."  (Decl. Lopez ¶ 23, ECF No.

4    17-6.)  Thus, respondent, the employer, had knowledge of its employee Bartolomucci's union activities.

5    Moreover, respondent's former service manager, Victor Corona, testified about an atmosphere of

6    antiunion sentiment, saying that service managers were instructed to give work to the employees on the

7    company's "team" – the "nonunion guys."  (Tr. 392:8–21, ECF No. 4-3.)  Bartolomucci testified before

8    the ALJ that respondent campaigned against the Union and, at a Union rally at Fairfield Toyota,

9    respondent's manager Mattice referred to Bartolomucci and two other Union supporters as "rats."  (*Id.*

10   at 57:1–58:6.)  Thus, petitioner's evidence tends to prove respondent's antipathy towards the union.

11   Finally, the timing of the firing is further circumstantial evidence of antiunion animus because it

12   occurred only a few hours after Bartolomucci told his manager he was going to call the Union to report

13   what he perceived to be an unfair allocation of work assignments, which the manager said she perceived

14   as a threat.  (Affs. & Docs. in Supp. of Pet. for Injunction, Ex. G, ECF No. 4-7, at 7:9–11.)

15         Respondent opposes an injunction arguing there is insufficient evidence to show a

16   likelihood of success on the merits.  Respondent argues Corona's testimony is not to be believed,

17   because it is contradicted by respondent's employees' declarations.  (ECF No. 17:12–15.)  Respondent's

18   argument, however, overlooks the procedural posture of the section 10(j) injunction, because at this

19   stage, a "conflict in the evidence does not preclude the Regional Director from making the requisite

20   showing for a section 10(j) injunction."  *Scott ex rel. NLRB v. Stephen Dunn & Assocs.*, 241 F.3d 652,

21   662 (9th Cir. 2001), *abrogated on other grounds as recognized by HTH Corp. I*, 650 F.3d at 1355.

22         Moreover, the ultimate decision in this case—whether the termination of Bartolomucci

23   was motivated by antiunion animus—will likely turn on credibility determinations.  On this issue, the

24   ALJ's determination will be subject to deference by both the Board and, ultimately, the U.S. Court of

25   Appeals asked to enforce the Board's order.  *See Retlaw Broad. Co. v. NLRB*, 53 F.3d 1002, 1006 (9th

26   Cir. 1995) ("Credibility determinations by the ALJ are given great deference, and are upheld unless they

27   are 'inherently incredible or patently unreasonable.'" (internal quotation marks omitted)); *Salt River*

28   *Valley Users' Ass'n*, 272 N.L.R.B. 296, 297 (1984) ("The Board's established policy is not to overrule

16

1    an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant

2    evidence convinces us that they are incorrect.").

3           Even though this court "is not the ultimate fact-finder," *Excel Case Ready*, 238 F.3d at

4    71 n.2, it finds Corona's testimony is not on its face inherently incredible.  Unlike Bartolomucci and his

5    Union representative on the one hand, and respondent's employees on the other, respondent's cross-

6    examination of Corona did not elicit evidence of bias or improper motive.  *Cf. United States v.*

7    *Mohamed*, 410 F. Supp. 2d 913, 916 (S.D. Cal. 2005) ("[B]ias and improper motive evidence has been

8    favored as a basis for attacking credibility of and weight to be given to testimony.").  Moreover, the

9    court notes that the ALJ sequestered the witnesses, and yet Corona's testimony was mostly consistent

10   with Bartolomucci's description of the shop.  Thus, there appears to be substantial evidence of a policy

11   or practice allowing employees to take discarded tires.  Even statements from respondent's employees

12   contained in its proffered evidence show that Bartolomucci openly took tires, which is consistent with a

13   practice or policy allowing him to do so.  For example, H.R. Manager Lopez declared that another

14   technician said he "assumed [taking the tires] was OK because Frank was doing it in plain sight."

15   (Decl. Lopez ¶ 12, ECF No. 17-6.)  In short, the evidence is consistent with the Regional Director's

16   contention that there was a practice or policy at Fairfield Toyota allowing employees to take tires.

17           The court reaches the same conclusion regarding respondent's other purported

18   justification for the termination: Bartolomucci's insubordination.  Even considering respondent's

19   proffered evidence, the system of assigning work and compensation at Fairfield Toyota begets

20   complaints about assignments.  Moreover, Corona credibly testified that technicians like Bartolomucci

21   complaining about assignments, and refusing to do assigned tasks occurred as often as "two or three

22   times in one day."  (Tr. 398: 17–23, ECF No. 4-3.)  Perhaps respondent ultimately will persuade the

23   ALJ or the Board that notwithstanding the strong circumstantial evidence of antiunion animus,

24   respondent nonetheless meets its "burden of establishing . . . the inevitability of termination," *Schaeff*

25   *Inc.*, 113 F.3d at 267 n.5, as an affirmative defense, because one incident was the straw that broke the

26   camel's back.  But this conclusion is undermined by the fact that Bartolomucci has been disciplined

27   only twice before, and not for this type of behavior.  (Tr. 126–131.)  Moreover, on cross-examination of

28   petitioner's witnesses before the ALJ, respondent did not elicit supporting evidence sufficiently

probative to establish that Bartolomucci's termination was inevitable, or to undermine petitioner's contention that Bartolomucci's termination was pretextual.  Although respondent's declarations attached to its answer tell a different story, the ALJ and this court "need not treat self-serving declarations of an employer as conclusive, even if not contradicted by any direct testimony in the record." *NLRB v. Searle Auto Glass, Inc.*, 762 F.2d 769, 774 (9th Cir. 1985).  Here, respondent's declarations are directly contradicted by competent and apparently credible testimony that mostly held up under cross-examination by respondent.

Therefore, the court finds that petitioner has shown a sufficient likelihood of success on the merits to warrant the issuance of a temporary injunction reinstating Bartolomucci.

2.      Unilateral Change to the Tire Policy

Petitioner also argues respondent unilaterally changed the policy regarding used tires in violation of section 8(a)(5) of the NLRA, 29 U.S.C. § 158(a)(5).  Section 8(a)(5) of the NLRA imposes a duty on employers "to bargain collectively" with union representatives over the terms and conditions of employment.  29 U.S.C. § 158(a)(5).  Accordingly, an "employer's unilateral change in conditions of employment" is a violation of § 8(a)(5) even in the absence of subjective bad faith.  *NLRB v. Katz*, 369 U.S. 736, 743 (1962).  The Supreme Court has explained that an employer's unilateral changes to its employees' work conditions "plainly frustrate[] the statutory objective of establishing working conditions through bargaining," because a unilateral change undermines the collective bargaining process.  *Id.* at 744.

The Supreme Court in *Katz* used the facts in that case to "illustrate the policy and practical considerations which support[ed] [its] conclusion."  *Id.*  In *Katz*, the employer changed the sick-leave policy, decreasing the annual number of paid sick days from ten to five; however, the employer also increased the maximum amount of accumulated sick days from previous years, from five to ten.  *Id.*  The Supreme Court explained how this policy change undermined the union: "Some employees might view the change to be a diminution of benefits.  Others, more interested in accumulating sick-leave days might regard the change as an improvement."  *Id.*  "[I]f the employees were . . . evenly divided . . . , the union negotiators, beset by conflicting factions, might be led to adopt a protective vagueness on the issue of sick leave, which . . . would inhibit the useful discussion

contemplated by Congress in imposing the specific obligation to bargain collectively." *Id.*  Further,

even if a unilateral policy change is objectively benevolent, such as an across-the-board wage increase,

it is nonetheless "necessarily inconsistent with a sincere desire to conclude an agreement with the

union." *Id.* at 745.  In *Katz*, the wage increase instituted unilaterally by the employer "was considerably

more generous than that which had shortly theretofore been offered to and rejected by the union," and

the court concluded this evinced an attempt to disrupt the union and "bad faith in negotiations." *Id.*

Not all unilateral changes in work conditions violate the NLRA, however.  "[T]he

Board has made clear that in order to constitute a unilateral change that violates the Act, an employer's

action must effect a material, substantial, and significant change in terms or conditions of employment."

*EAD Motors E. Air Devices, Inc.*, 346 N.L.R.B. 1060, 1065 (2006).  Moreover, "a threat of discipline

for a breach of a unilaterally implemented policy is sufficient to establish that the policy constitutes a

material change in working conditions."  *Ferguson Enters., Inc.*, 349 N.L.R.B. 617, 618 (2007).

In this case, petitioner asserts the practice allowing employees to take home discarded

tires was a mandatory subject of bargaining and respondent's unilateral change—from lax to strict

enforcement—effected a "material, substantial, and significant change," because it was accompanied by

the threat and indeed the imposition of discipline, Bartolomucci's firing.  (ECF No. 4, at 40:11–22.)

Respondent counters pointing out that its Employee Handbook has, since 2010, prohibited "the removal

of company property . . . without express permission from the appropriate supervisor or manager."

(ECF No. 17, at 13:14–23 (quoting Lopez Decl., Ex. B, at 31).)  Respondent also contends that the

declaration of Bartolomucci's manager Sheila Bamba evinces that "[s]he did not give [Bartolomucci]

permission" to take tires, and argues there is insufficient evidence therefore to support petitioner's claim

under section 8(a)(5) of the NLRA.  (*Id.* at 13:24–25 (citing Bamba Decl. ¶ 12).)

Here, as discussed above, the court concludes the evidence supports the Regional

Director's contention that there was a practice or policy at Fairfield Toyota allowing employees to take

tires.  Moreover, respondent's argument that the existence of the policy prohibiting the removal of

company property, contained in the Employee Handbook since 2010, precludes a finding that the policy

was unilaterally changed is unavailing in light of contrary authority.  In *Beverly Health & Rehabilitation*

*Services, Inc.*, the employer maintained a policy requiring employees who were out sick on weekends to

1    provide a doctor's excuse and announced that this policy was going to be enforced.  346 N.L.R.B. 1319,

2    1327 (2006).  However, the evidence showed that, even though the policy "had been in existence for

3    some time before the March  announcement," prior to that point, the employer was "not requesting

4    doctors' excuses for weekend calloffs."  *Id.*  The Board concluded that the recent enforcement of "this

5    previously dormant policy" amounted to "an unlawful unilateral change in working conditions," *id.*, and

6    ordered the employer to rescind the enforcement of the weekend out-sick policy pending collective

7    bargaining, among other relief, *id.* at 1332.  *See also El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 657 (5th

8    Cir. 2012) ("If . . . the employer 'begins to strictly enforce previously existing rules which had not

9    earlier been enforced,' § 8 of the NLRA is violated."); *Flambeau Airmold Corp.*, 334 N.L.R.B. 165, 166

10   (2001) (concluding that even though respondent's written policy "states that employees are required to

11   give 3 days' notice before taking vacation," because "the Respondent has not previously enforced this

12   requirement on employees taking vacation leave," and "Respondent's actual practice was for employees

13   to give 1 day's notice to obtain approval for vacation leave," respondent violated section 8(a)(5)).

14          This court concludes that, as in *Beverly Health & Rehabilitation Services, Inc.*, the

15   Board is likely to find that the policy prohibiting employees from taking company property was

16   "previously dormant."  *Id.* at 1327.  The evidence shows that, over time, this policy was not strictly

17   enforced with regard to tires; thus, the policy's recent enforcement amounts to a unilateral change in

18   violation of section 8(a)(5) of the NLRA.  The court reaches this conclusion considering the deference

19   due the Regional Director, particularly in cases such as this, where the Board itself has approved the

20   petition for a section 10(j) injunction.  *HTH Corp. I*, 650 F.3d at 1356; *see also HTH Corp. II*, 693 F.3d

21   at 1062.

22          Accordingly, the court concludes petitioner has shown a strong likelihood of success on

23   the merits and turns now to the remaining equitable factors.

24      B.   Irreparable Harm

25          In the section 10(j) context, "irreparable injury is established if a likely unfair labor

26   practice is shown along with a present or impending deleterious effect of the likely unfair labor practice

27   that would likely not be cured by later relief."  *HTH Corp. I*, 650 F.3d at 1362.  "[T]he discharge of

28   active and open union supporters risks a serious adverse impact on employee interest in unionization

20

1   and can create irreparable harm to the collective bargaining process." *Excel Case Ready*, 238 F.3d at 74

2   (internal quotation marks and alteration omitted).  "Moreover, the fear of employer retaliation after the

3   firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j)." *Id.* at 75.

4   Accordingly, the Ninth Circuit has held "a likelihood of success as to a § 8(a)(3) violation with regard to

5   union activists that occurred during contract negotiations . . . largely establishes likely irreparable harm,

6   absent unusual circumstances." *HTH Corp. I*, 650 F.3d at 1363.  Further, in the section 8(a)(5) context,

7   the irreparable harm "in an employer's unilateral implementation of terms and conditions of

8   employment is to the Union's status as bargaining representative, in effect undermining the union in the

9   eyes of the employees." *Pepsi-Cola Bottling Co. of Fayetteville, Inc.*, 315 N.L.R.B. 882, 904 n.40

10  (1994).

11          Respondent argues the absence of irreparable harm largely because, in its view,

12  Bartolomucci's participation on the collective bargaining committee was not essential because,

13  respondent says, he was not "an effective spokesperson for" other employees.  (ECF No. 17, 14:19–22.)

14  Respondent argues that because Bartolomucci only used the bargaining process "as a forum to complain

15  about his *personal* circumstances," his absence is unlikely to inflict irreparable harm.  (*Id.* at 14:21–25

16  (emphasis in original).)  Accordingly, respondent argues petitioner's pleas that the Union will be

17  deprived of its "eyes and ears" are overstated and argues irreparable harm to the bargaining process has

18  not occurred and is unlikely to occur even if Bartolomucci is not reinstated.  Regarding the unilateral

19  policy change, respondent argues the "so-called change in the tire policy has not resulted in any adverse

20  impact . . . because none of the other technicians ever believed they were permitted to take tires in the

21  first place." (*Id.* at 17:7–9 (citing various declarations).)

22          Petitioner counters that irreparable harm has already occurred in the wake of the

23  termination of an active Union supporter and the unilateral policy change, pointing to the fact that in the

24  months after Bartolomucci's termination, twelve of the thirteen remaining technicians signed a petition

25  to decertify the Union.  (ECF No. 18, at 7:7–10.)

26          Here, as previously discussed, petitioner has shown a likelihood of success on the

27  merits as to a § 8(a)(3) violation, which "establishes likely irreparable harm, absent unusual

28  circumstances." *HTH Corp. I*, 650 F.3d at 1163.  Respondent's arguments that Bartolomucci need not

be present at the collective bargaining table overlook another perhaps more important potential harm: the chilling effect on unionization and collective bargaining that the "discharge of active and open union supporters risks." *Excel Case Ready*, 238 F.3d at 74. The specter of irreparable harm has arguably already materialized in this case, in the form of the twelve technicians voting to decertify the Union.

Moreover, regarding the alleged § 8(a)(5) violation, respondent's argument that harm has not occurred from the alleged change to the tire policy because other technicians did not believe "they were permitted to take tires in the first place" overlooks the pertinent adverse impact of unilateral changes: harm to the bargaining process. As noted above, even a unilateral change that positively impacts employees, such as an across-the-board wage increase, can inflict irreparable harm because it undermines "the useful discussion contemplated by Congress in imposing the specific obligation to bargain collectively" over such terms and conditions of employment with union representatives. *Katz*, 369 U.S. at 744. Considering the remaining technicians' loss of faith in the ability of the Union representatives to bargain with their employer, which can be inferred from the vote to decertify the Union, petitioner has shown the potential for irreparable harm to the collective bargaining process.

Accordingly, the court finds that petitioner has shown likely irreparable harm will result in the absence of interim relief.

C.     <u>The Balance of Hardships and Public Interest</u>

The Ninth Circuit has held that a district court's determination that the "Regional Director had shown likely irreparable harm to the collective bargaining process meant that there was also considerable weight on his side of the balance of the hardships." *HTH Corp. I*, 650 F.3d at 1365. Likewise,  if "the Director makes a strong showing of likelihood of success and of likelihood of irreparable harm, the Director will have established that preliminary relief is in the public interest." *Id.*

Here, for the reasons stated above, the Regional Director has shown that the unfair labor practice claim will likely succeed and that irreparable harm is likely to result; the balance of hardships and the public interest thus support granting interim relief. Respondent's only counterargument — that it will suffer hardship by being "forced to permit employees to take used tires" and to allow employees to yell at their supervisors — is of little moment, because nothing in this court's order prevents respondent from subjecting employees to discipline for neutral reasons such as violations of pre-existing

company policy.  (ECF No. 17, 18:14–19.)  Instead, the injunction promotes the public interest by preserving the NLRB's remedial power, and the balance of hardships favors injunctive relief.  *See HTH Corp. I*, 650 F.3d at 1365.  Therefore, the court finds that injunctive relief is in the public interest, and the balance of hardships favors granting petitioner's request for interim relief.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, the court finds that injunctive relief is "just and proper," 29 U.S.C. § 160(j), and the Regional Director's petition for temporary relief is GRANTED.

The court HEREBY ORDERS respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, to cease and desist from the following acts and conduct, pending the final disposition of this matter now pending before the Board:

a.   Firing employees because employees formed, joined, and/or assisted the Union and engaged in concerted activities, and/or to discourage employees from engaging in these activities;

b.   Unilaterally changing unit employees' terms and conditions of employment without first providing the Union with notice and an opportunity to bargain; and

c.   Enforcing its unilaterally changed policy regarding the removal of scrap tires from its facility.

The court FURTHER ORDERS respondent, its officers, representatives, supervisors, agents, servants, employees, attorneys and all persons acting on its behalf or in participation with it, to take the following steps pending the final disposition of the matter now pending before the Board:

a.   Offer employee Frank Bartolomucci immediate reinstatement to the job position he previously held, or to a substantially equivalent position if his position no longer exists, without prejudice to his rights and privileges, displacing, if necessary, any newly hired applicants;

b.   At the Union's request, rescind the policy preventing employees from removing scrap tires from respondent's facility and, if requested, provide an opportunity for the Union to bargain over any changes to said policy;

///

c.  Post copies of this Order at its facility located at 2575 Automall Parkway, Fairfield, California, in all places where notices to its employees are normally posted; maintain these postings during the Board's administrative proceeding free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to Board Agents reasonable access to its facilities to monitor compliance with this posting requirement;

d.  Within fourteen (14) days of the date of this Order, hold a meeting or meetings at respondent's facility scheduled to ensure the widest possible audience, at which a responsible management official, in the presence of a Board Agent, will read this order to employees, or at respondent's option, have a Board Agent read the Order in that official's presence; the respondent shall notify the Union in advance of the time and date of such meeting(s) and an official of the Union may be present at such meeting(s) to monitor the reading of the Order; and

e.  Within twenty-one (21) days of the issuance of this order, file with the court and serve upon the Regional Director of Region 20 of the Board, a sworn affidavit from a responsible official describing with specificity the manner in which respondent has complied with the terms of the Order, including the locations of the posted documents and the time, location, and number of attendees at the meeting(s) where the order was read to employees.

The court ADDITIONALLY ORDERS that no later than seven (7) days after the ALJ issues his final recommendation, the parties shall file a Joint Status Report with the court briefly setting forth the decision of the ALJ and the schedule for further proceedings before the Board.

IT IS SO ORDERED.

DATED:  January 13, 2014.

_____
UNITED STATES DISTRICT JUDGE

24